No. 23,379.

ANNA M. VOGLER, *Appellee*, v. MAX VOGLER, *Appellant*, et al.

### SYLLABUS BY THE COURT.

PARTITION—*Homestead Rights Involved and Determined.* Record examined, and held to sustain the findings and judgment that the plaintiff is entitled to her homestead interest in the property involved, and that her stepson is not owner thereof or her landlord in respect thereto.

Appeal from Marshall district court; FRED R. SMITH, judge. Opinion filed January 7, 1922. Affirmed.

*Edgar Bennett, Charles Smith,* and *Frank McFarland,* all of Washington, for the appellant.

*W. J. Gregg,* of Frankfort, and *W. W. Redmond,* of Marysville, for the appellee.

The opinion of the court was delivered by

WEST, J.: This action was brought by the plaintiff against her stepchildren and others to partition a piece of town property claimed by her as a homestead. She alleged that in 1907 her husband, Joseph Vogler, bought the place for $800, paying $50 down, and taking a written agreement of conveyance to him on payment of the balance of the consideration, and that she and her husband went into possession and occupied it until October 6, 1917, when her husband died; that she thereafter continued in possession until January, 1919, when she went on a visit, and while gone, Max Vogler forcibly took possession. Also, that her husband, Joseph Vogler, paid the balance of the purchase price, but without his knowledge, consent or approval the deed was made to Max Vogler, who took it with the full knowledge of the facts and circumstances.

Max Vogler answered that with the full knowledge of the plaintiff and her husband he took the deed and has ever since been the legal and equitable owner of the property, his father and stepmother being his tenants by sufferance.

The court found the allegations of the petition true, and that the defendant, Hugo P. Vogler, had tendered a quitclaim deed to the defendant, Max Vogler, and gave the plaintiff an undivided one-half of the property involved, and ordered partition.

The plaintiff testified among other things that she married Joseph Vogler in 1903, and in 1907 moved into the property and lived there until they both got sick, when her son came and got her and Theodore Vogler got his father.

"When we went away we left our furniture in the house. In January after my husband died, Max notified me he had rented the house. I have never taken the furniture out. That is the only home we had."

Mr. Cottrell, of whom the place was bought, testified that when it came to making out the deed he looked it over and saw that it read Max instead of Joseph, "and Max spoke up and said 'Never mind, the deed is alright,' " Further, that he received the full purchase price, the balance after the first payment being paid by check. He did not know who signed it, but to the best of his recollection it was handed him by Max Vogler.

Max Vogler testified to a considerable supervision of the affairs of his father, and the handling of checks and the like, and that in 1914 he sent him $2,000 which his father mailed back to him. His brother, Theodore Vogler, testified that his father came down to see him in August, 1917, and he, Theodore, told Max he wanted money and to give him $2,000, and Max said he did not owe him $2,000, just $1,800; that after this he still collected the rents for his father. Max testified that he did not know when he got this $1,800, but that he began to handle it in 1910 or 1912 "along in there some time" and handled the rents until his father died.

"Q. You used $1,000 of his money to build a barn on his farm?   A. Yes, sir; well, perhaps; I don't know.

"Q. You claimed you did when he asked for a settlement before he died, didn't you?   A. Yes, sir; according to agreement.

"Q. You got him to sign a receipt saying it was all right for you to use that $1000. You claimed you did.   A. Yes, sir.

"Q. That was out of that $1800?   A. Yes, sir. . . .

"Q. You never paid any of that $1800 back to him?   A. No, sir. . . .

"Q. Now, Mr. Vogler, all the real estate that he had since he married her was in your name, wasn't it?   A. No, sir; he had 160 acres that was not in my name.

"Q. When he married her?   A. Yes, sir; when he married her.

"Q. I mean all that he has had since was in your name when he died; everything that he owned had passed into your name in the way of real estate.   A. Yes, sir.

"Q. This piece of property here in town was in your name?   A. Yes, sir.

"Q. What was your purpose in handling all his money?   A. It was his request.

"Q. He wanted you to do the business?   A. Yes, sir.

"Q. Was that after he was married that he made that request?   A. Sir.

"Q. After he was married, was it, that he made the arrangement?   A. I have

handled his money almost since I was born. I was five years old when I commenced to handle father's business.

"Q. When you were five years old? A. Yes, sir; commenced when I was five years old.

"Q. Well, you were quite precocious, weren't you? A. It's a fact; yes, sir."

We think the court was fully justified in stating "the testimony shows that Max Vogler was in possession of $1,700 of Joseph Vogler's money up until 1917, and that is not explained." An examination of the abstract and counter abstract fully convinces that the judgment rendered by the court was abundantly sustained by the evidence, and that the manifest intent to deprive the stepmother of her homestead was eminently improper.

The judgment is affirmed.